******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ERYN GILLIGAN
(AC 37031)

Beach, Sheldon and Pellegrino, Js.

*Argued December 3, 2015—officially released April 5, 2016*

(Appeal from Superior Court, judicial district of Tolland, geographical area number nineteen, Graham, J.)

*Pamala J. Favreau*, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Andrew Reed Durham*, assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Eryn Gilligan, appeals from the judgment of conviction, rendered following a jury trial, of operating a motor vehicle while under the influence of alcohol or drugs or both in violation of General Statutes § 14-227a (a) (1). The defendant claims that the trial court erred by (1) admitting into evidence expert testimony regarding the quantitative results of her urine test and (2) finding that she was a second offender pursuant to General Statutes § 14-227a (g). We affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury, and procedural history are relevant. At approximately 8:25 p.m. on December 29, 2011, while Timothy Begley, a sergeant with the state police, was patrolling Route 32 in Stafford, he noticed a vehicle swerving back and forth within a lane of travel and crossing the double yellow line. Begley stopped the vehicle, which the defendant was driving. The defendant was talking rapidly, her eyes were red and watery, and her pupils were "very dilated." Upon moving his flashlight toward her eyes, Begley noticed that the defendant's pupils were "very slow to constrict" and did so "only very slightly," which indicated to Begley that the defendant was possibly under the influence of a central nervous system stimulant. Begley detected the odor of alcohol on the defendant's breath and asked the defendant if she had been drinking. The defendant responded that she had consumed one drink prior to operating the vehicle. Begley asked the defendant if she would submit to field sobriety tests, and he noticed that the defendant was not very stable when exiting her car. Begley performed three field sobriety tests on the defendant: the horizontal gaze nystagmus test; the one leg stand test; and the walk and turn test. The defendant was not able to perform any of the three tests to standard.[1] Begley placed the defendant under arrest.

While at the state police barracks in Tolland, the defendant completed an implied consent form. When Begley asked the defendant if she had been drinking, she stated that she started drinking around 7 p.m. and stopped drinking around 8:25 p.m., and during that time, she drank two beers. When asked if she had taken any drugs, she further stated that she had used one line of cocaine at approximately 7:30 p.m. Beyer asked the defendant if she would consent to chemical testing and she agreed. At 8:59 p.m., a breath test was administered to the defendant,[2] and at 9:09 p.m., a urine test was conducted.

The defendant was convicted by a jury of operating a motor vehicle while under the influence of alcohol or drugs or both. Following a trial to the court on a part B information, the defendant was found guilty of being a second offender. She was sentenced to two

years incarceration, execution suspended after six months, and two years probation. This appeal followed.

I

The defendant first claims that the court erred in admitting into evidence testimony by the state's toxicology expert, Dr. Robert Powers, regarding a chemical analysis concerning cocaine found in the defendant's urine in violation of § 14-227a (b) (2) and (5). We conclude that the admission of Powers' testimony at issue was harmless error.

Section 14-227a (b) provides in relevant part: "Except as provided in subsection (c) of this section, in any criminal prosecution for violation of subsection (a) of this section, *evidence respecting the amount of alcohol or drug in the defendant's blood or urine at the time of the alleged offense*, as shown by a chemical analysis of the defendant's breath, blood or urine shall be admissible and competent provided . . . (2) a true copy of the report of the test result was mailed to or personally delivered to the defendant within twenty-four hours or by the end of the next regular business day, after such result was known, whichever is later . . . (5) an additional chemical test of the same type was performed at least ten minutes after the initial test was performed or, if requested by the police officer for reasonable cause, an additional chemical test of a different type was performed to detect the presence of a drug or drugs other than or in addition to alcohol, provided the results of the initial test shall not be inadmissible under this subsection if reasonable efforts were made to have such additional test performed in accordance with the conditions set forth in this subsection and such additional test was not performed or was not performed within a reasonable time, or the results of such additional test are not admissible for failure to meet a condition set forth in this subsection . . . ." (Emphasis added.)

At trial, the state called Powers as an expert witness. He was the deputy director for controlled substances and toxicology and chemistry at the Connecticut Forensic Laboratory in the Department of Emergency Services and Public Protection. Outside the presence of the jury, the state responded that it intended to offer one page of the laboratory report that concerned only the presence of cocaine and benzoylecgonine and that it did not intend to introduce evidence concerning precise amounts found. When the state indicated that it might question Powers about his findings "regarding quantities" of cocaine and benzoylecgonine in the urine sample "but not in terms of specific numbers," the defendant objected on the ground that such testimony was inadmissible because § 14-227a (b) (2) and (5) had not been complied with. Upon the court's request and outside of the presence of the jury, the state proffered the testimony from Powers that it expected to elicit in the presence of the jury.

In response to testimony elicited from Powers during the proffer, the court ruled that § 14-227a (b) (2) had not been satisfied. Powers was directed not to testify regarding the quantity of cocaine, or of its metabolite, in the urine sample, nor could he testify using terms such as high, medium, or low in reference to those substances. The state then elicited testimony from Powers that once cocaine is ingested, the body starts to form the metabolite of cocaine, benzoylecgonine. The greater the ratio of cocaine to benzoylecgonine, the more recent the ingestion of cocaine would be, as cocaine is replaced over time by its metabolite, which is created by the body's metabolism of cocaine. The state argued that the proffered testimony made no reference to actual numbers or quantities and, therefore, was not precluded by application of § 14-227a (b). The defendant objected on the ground that the testimony "goes to the ratio." The court ruled that such testimony was permissible because "[t]he language of the statute says evidence respecting the amount of drug in the defendant's urine. He is not quantifying—he is not categorizing the amount of drug, he is simply saying it's more or less than a metabolite, and that really doesn't say anything about the amount."

At trial and in the presence of the jury, Powers testified that an analysis of the defendant's urine sample revealed that the sample contained cocaine and benzoylecgonine, the metabolite of cocaine. He stated that a "metabolite" is "a molecule that the body produces from another molecule; it's what we break a molecule down into." He explained that the ratio between cocaine and benzoylecgonine can determine how recently the ingestion of cocaine occurred. He testified that "there was more cocaine in the defendant's urine than metabolite" and opined that this fact indicated "a relative[ly] recent ingestion" of cocaine by the defendant.

The defendant argues that Powers' testimony regarding the ratio of cocaine to its metabolite was inadmissible because a copy of the report was not mailed to or personally delivered to the defendant within twenty-four hours of the testing or by the end of the next regular business day after such result was known, in violation of § 14-227a (b) (2); and a second chemical test of the same type was not performed on the urine sample at least ten minutes after the first test in violation of § 14-227a (b) (5). The state agrees that the toxicology lab did not send the defendant a copy of the report setting forth the specific amount of cocaine in the urine sample and did not perform a second chemical test on the sample within the requisite time frame. The defendant contends that the term "amount" is not narrowly defined in § 14-227a (b). She maintains that the process of computing the "ratio" of cocaine to benzoylecgonine necessarily requires the use of the "amount" of the drug in the body. Testimony regarding ratio of

cocaine to metabolite, then, should have been precluded in this case by § 14-227a (b). The state argues that Powers' testimony regarding the general ratio of cocaine to its metabolite was nonetheless admissible because § 14-227a (b) bars the admission only of evidence regarding the "amount" of alcohol or drug in the defendant's urine. Powers' testimony did not address the amount of cocaine, the state argues, but rather the time frame in which the defendant ingested the cocaine. The state argues alternatively that any error was harmless.

"[I]n order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 797–98, 847 A.2d 921 (2004). In this case, the question of whether the court erred in admitting the testimony at issue into evidence requires us to interpret § 14-227a (b). "Issues of statutory construction raise questions of law, over which we exercise plenary review." (Internal quotation marks omitted.) *State* v. *Boysaw*, 99 Conn. App. 358, 362, 913 A.2d 1112 (2007).

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, [we] first . . . consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State* v. *Custer*, 110 Conn. App. 836, 840, 956 A.2d 604 (2008).

Section 14-227a (b) unambiguously provides that "evidence respecting the amount of alcohol or drug in the defendant's blood or urine at the time of the alleged offense" is admissible provided that certain requirements have been satisfied. The term "amount," however, is not further defined in the statute. "When a statutory term is not defined, or cannot be ascertained by means of related statutory provisions, courts must apply its plain and ordinary meaning. . . . [I]t is a cardinal rule of statutory construction that statutory words and phrases are to be given their ordinary meaning in accordance with the commonly approved usage of the language . . . . To ascertain the commonly

approved usage of a word, we look to the dictionary definition of the term." (Citation omitted; internal quotation marks omitted.) *In re Pedro J. C.*, 154 Conn. App. 517, 535, 105 A.3d 943 (2014).

In the context of this case, we necessarily consider the concepts of "ratio," the subject of the testimony admitted in court, and "amount," the relevant word in the applicable statute. The term "ratio" is defined, in part, as "the relationship in quantity, *amount*, or size between two or more things;" and the term "amount" is defined, in part, as "the total number or quantity . . . ." (Emphasis added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). A ratio, by definition applicable in the circumstances of this case, expresses the relationship between two or more amounts. Although Powers' testimony as to ratio did not express the amount of cocaine in the defendant's system in terms of an absolute quantity, it did state the amount of cocaine in her system in relation to the quantity of metabolite. The integrity of the testimony regarding ratio depended entirely on the integrity of the underlying "amount" used in the computation. Because evidence of amount was properly excluded by application of § 14-227a (b), then evidence of ratio, dependent upon amount, likewise should have been precluded in the circumstances of this case.[3]

The state argues, alternatively, that any error was harmless. "Where an evidentiary ruling has been found to be incorrect, but the improper ruling, as here, does not implicate a constitutional right of the defendant, the burden rests on the defendant to establish the harmfulness of the claimed impropriety. . . . In order to establish the harmfulness of a trial court ruling, the defendant must show that it is more probable than not that the improper action affected the result. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citations omitted; internal quotation marks omitted.) *State* v. *Russo*, 62 Conn. App. 129, 137, 773 A.2d 965 (2001).

We agree with the state and conclude that the defendant has not shown that Powers' disputed testimony was harmful. The import of the testimony regarding ratio was that the defendant had, in quite vague terms, "recently" ingested cocaine. The evidence of a recent ingestion was only cumulative of other evidence at trial, the admission of which was not contested on appeal. While at the police barracks, the defendant stated to Begley that she had ingested one line of cocaine at approximately 7:30 p.m. that night, approximately one hour prior to her arrest and one and one-half hours before the sample was obtained.

There was also substantial evidence of intoxication. Begley testified that the defendant failed three field

sobriety tests; he smelled alcohol on the defendant's breath; he noticed rapid speech and red watery eyes with "very dilated" pupils that were "very slow to constrict" when Begley moved his flashlight toward her eyes; and the defendant said that she drank two beers between 7 p.m. and 8:25 p.m. and had ingested one line of cocaine at 7:30 p.m. Further, a portion of the lab report, to which the defendant did not object, established the presence of cocaine and benzoylecognine in the defendant's urine sample.

Finally, the testimony as to the ratio was itself only mildly inculpatory. A conclusion of "recent" ingestion—especially where ingestion itself was not in issue—covered a lot of potential territory. The jury received little guidance from the testimony in any event. We conclude that the admission of Powers' testimony as to the ratio of cocaine in relation to benzoylecognine in the defendant's urine was harmless error.

II

The defendant next claims that the state did not present sufficient evidence as to identity in the context of her conviction as a second time offender pursuant to § 14-227a (g). We disagree.

After a trial to the court on the part B information, the court concluded that the state had proved beyond a reasonable doubt that the defendant previously had been convicted, specifically on June 27, 2006, of operating a motor vehicle while under the influence of alcohol or drugs. The court noted, and the defendant stresses, that the 2006 offense was committed by "Eryn Eaton" and the offense in the present case was committed by "Eryn Gilligan." The court stated, "The evidence far exceeds the question of the congruity of name; social security number is the same; driver's license number is the same; date of birth is the same throughout the documents, including the documents relating to both this conviction and the prior conviction of June 27, 2006." The court concluded: "[A] name change alone does not . . . indicate that it's not the same person; it clearly is the same person proven beyond a reasonable doubt."

The standard of review employed in a sufficiency of the evidence claim is well settled. We apply "a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Glasper*, 81 Conn. App. 367, 371, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

The defendant argues that the state presented insufficient evidence to show that she was the perpetrator of

the first offense of operating a motor vehicle while under the influence of alcohol or drugs, on June 27, 2006. She contends that no direct evidence was presented by the state in the part B trial about her part A conviction the day before, that there was neither an in-court identification of her as the perpetrator of the part A conviction the day before nor an in-court identification of her as the perpetrator of the 2006 offense. She further contends that there was no testimonial evidence that the photographs entered by the state into evidence in the part B trial, state's exhibits B-3 and B-4, depicted the defendant.

It is clear from the record, however, that overwhelming evidence of identity was introduced. Christopher Cwikla, an analyst employed by the Department of Motor Vehicles, testified that state's exhibits B-3 and B-4 had been culled from a database that stores images for the Department of Motor Vehicles. State's exhibit B-3 showed the license renewal photograph taken of "Eryn Gilligan," along with other identifying information; and state's exhibit B-4 included, along with other identifying information, the license renewal photograph of "Eryn Eaton," taken in 2005.

Further, the state introduced evidence of a divorce decree, which stated that Eryn Gilligan had married Mark Eaton in 1994, and that, by judgment dated August 2, 2007, the marriage between the two had been dissolved. The state introduced evidence that "Eryn Gilligan" and "Eryn Eaton" had the same date of birth, social security number and driver's license number. The state also submitted driver's license photographs for both Eryn Gillian and Eryn Eaton, which were taken approximately six years apart. The court found that "[e]ven without the photos, it would be clear . . . beyond a reasonable doubt" that the defendant is the same person who had been convicted on June 27, 2006, and, thus, that the state had proven beyond a reasonable doubt that the sentence enhancement applied. We conclude that the state presented overwhelming evidence at trial on the part B information as to the identity of the defendant. The defendant's contrary assertion, on the facts of this case, is meritless.

The defendant's identity as the perpetrator of the instant offense was established during the trial on the part A information. Although the proceeding was bifurcated into two stages, it was nonetheless one proceeding. "A two part information is required under our rules of practice whenever the state seeks an enhanced penalty. Practice Book § 36-14. The purpose of this rule is to ensure that the defendant is given adequate notice of the charge against him so that he properly may prepare his defense. . . . Thus, although a prosecution involving a two part information requires two separate proceedings, it nevertheless remains a single prosecution under one information. . . . The second part of

the information must be proven, however, before the enhanced penalty can be imposed." (Citations omitted.) *State* v. *Fagan*, 280 Conn. 69, 92–93, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007); see also *State* v. *Nasheed*, 121 Conn. App. 672, 683, 997 A.2d 623 (where jury found defendant guilty of robbery in first degree in part A proceeding and court in part B proceeding found that defendant had previously been convicted of robbery in second degree, evidence was sufficient to conclude that defendant was persistent dangerous felony offender under sentence enhancement statute, General Statutes § 53a-40), cert. denied, 298 Conn. 902, 3 A.3d 73 (2010). Having presided over the immediately preceding jury trial on the first part of the proceeding, the court was fully entitled to conclude that the person sitting in court in the part B trial was the person who had just been convicted. We conclude that the court had before it sufficient evidence in the part B proceeding to establish the defendant's identity as a second offender.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant informed Begley that she had a neurological disorder that causes dizziness but that she was not dizzy at the time of the tests.

[2] The results of the breath test were not admitted at trial.

[3] A purpose of § 14-227a (b) quite clearly is to allow an accused to probe the accuracy of conclusions regarding intoxication. A conclusion of a toxicologist regarding the time of ingestion, a fact which might bear on intoxication at the time of the offense, may be difficult to probe in the absence of timely notification of the predicate quantities.